UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

KIA C. FARRIS,                          )
                                        )
                Plaintiff,              )
                                        )          No. 4:10-CV-62
v.                                      )
                                        )
MICHAEL J. ASTRUE,                      )          *Mattice / Lee*
Commissioner of Social Security,        )
                                        )
                Defendant.              )

## REPORT AND RECOMMENDATION

Plaintiff Kia C. Farris ("Plaintiff") was denied disability insurance benefits ("DIB") and supplemental security income ("SSI") by the Commissioner of Social Security ("Commissioner" or "Defendant"), and she now appeals that denial.[1]  Plaintiff has moved for summary judgment contending that the Administrative Law Judge ("ALJ") who heard her claim erred by discounting her subjective complaints of migraine headache pain and by giving little weight to a treating physician's opinion [Doc. 9].  For the reasons stated below, I **RECOMMEND** that Plaintiff's motion for summary judgment [Doc. 9] be **DENIED**; Defendant's motion for summary judgment [Doc. 13] be **GRANTED**; the decision of Commissioner be **AFFIRMED**; and this action be **DISMISSED WITH PREJUDICE**.

## I.    ADMINISTRATIVE PROCEEDINGS

Plaintiff protectively applied for DIB and SSI on January 7, 2005, alleging disability since October 30, 2003 (Tr. 50-54, 57).  The Agency denied Plaintiff's claim initially and upon reconsideration (Tr. 38-43, 45-48).  After a hearing held July 12, 2007 (Tr. 784-802), the ALJ found

---

[1] This action is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), which provide for judicial review of the final decision of the Commissioner denying DIB and SSI benefits.

Plaintiff was not disabled because she had a residual functional capacity ("RFC") for the full range of sedentary work and therefore she could perform her past work as a financial coordinator (Tr. 13-27). Plaintiff requested review by the Appeals Council and submitted additional reports from her treating neurologist, which were not considered by the ALJ, to the Appeals Council (Tr. 9, 559-573). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied review (Tr. 6-9), and this matter is now ripe for judicial review.

## II.     DISABILITY DETERMINATION PROCESS

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden of proof at the first four steps to show the extent of her impairments, but the burden shifts to the Commissioner at step five to show there are jobs the claimant can perform despite her impairments. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). In order to make the required

findings at steps four and five, the ALJ must assess the claimant's RFC, which refers to the maximum level of work the claimant can perform on a "regular and continuing basis"—i.e., for 8 hours per day, five days per week.  Social Security Ruling ("SSR") 96-8p.

## III.      FACTUAL BACKGROUND AND ALJ'S FINDINGS

### A.      Plaintiff's Allegations of Disability, Hearing Testimony, and Other Evidence

Plaintiff claims she is disabled due to several impairments, including migraine headaches, black out spells, anxiety and a cardiac condition.  She focuses on her migraine headaches in this appeal.

Plaintiff was 25 when she applied for benefits and 28 years old on the date of the ALJ's decision (Tr. 50, 786).  She had a high school education, and prior to the date her alleged disability began, Plaintiff had worked as a grocery store cashier, teacher's aide, dental assistant, and financial coordinator (Tr. 62, 90-95, 786-88).  At the July 12, 2007 hearing before the ALJ, Plaintiff testified she stopped working when she began having problems with migraine headaches (Tr. 790).  She testified that she experienced a migraine headache several times a month, as many as one to two per week (Tr. 790-92).  Her headaches, she stated, lasted from hours to days (Tr. 792).

Plaintiff testified she took Topamax (to control her migraine pain) every day (Tr. 791). Plaintiff's side effects included tingling sensations, which went away, and a "diesel taste" in her mouth (Tr. 791-92).  When asked, "What does the Topamax do for you in terms of headaches?" Plaintiff responded, "It really helps me.  I mean it can make a headache pretty much try to go away. Sometimes it don't take it all the way away but it does a really good job." (Tr. 791).

Her headaches were brought on by many things such as light, stress, breathing hard, seizures, supraventricular tachycardia ("SVT"), and heart palpitations (Tr. 792-923).  With regard to the SVT

and heart palpitations, Plaintiff reported that she had been put on various medications by her cardiologist, her doctor had recently implanted a device to monitor her heart rate, and since the device was implanted, she had no episodes (Tr. 787-90).  Plaintiff also stated she took Xanax for panic attacks and an anxiety disorder (Tr. 793).  She had problems controlling her diabetes (Tr. 788, 794).  Plaintiff testified that she could stand and sit continuously for an hour each; she could walk for 30 minutes, then she had shortness of breath and swelling (Tr. 795).  When asked if she agreed with Imhona A. Eko-Isenalumhe, M.D.'s ("Dr. Eko") limitation of lifting more than 10 pounds, she stated, "To an extent but I have two kids that I have to, to lift on, you know. I'm a mother." (Tr. 796).  She guessed that she could lift about 20 to 30 pounds one to three times an hour (Tr. 796).

When asked to explain why she would be absent from work more than three times a month, she testified that she had good days and bad days (Tr. 796-97).  On a bad day, which she experienced twice a week, she might have a migraine, fatigue, body aches, heart palpitations, or feel very weak and need to stay home (Tr. 797-99).

Plaintiff admitted she drove about five days in a week and she had not experienced a panic attack or seizure while driving, but had experienced heart palpitations (Tr. 797-98).  She stated the last time she had a seizure was at Christmas over a year and a half ago (Tr. 798).  Plaintiff shopped for groceries two or three times per month and, in a typical week, she cooked about twice a week, she also prepared breakfast and lunch, she helped her kids brush their teeth, and she did laundry (Tr. 798).  On a day she felt good, she tried to do something with her kids, like taking them to go swimming at her mother's house (Tr. 798).

At the close of the testimony and at Plaintiff's request, the ALJ stated that he would wait on

Plaintiff to send him updated records from Dr. Gupta and Dr. Han for his review prior to making his decision (Tr. 801).[2]

According to her disability report, Plaintiff stopped working on October 30, 2003, because stress made her blood pressure go up, made her heart race, and gave her headaches (Tr. 61; *see also* 787). She also alleged limitations in her ability to work due to her weight, diabetes, hypertension, SVT, panic attacks, thyroid problems, and back pain (Tr. 61). In a "pain questionnaire," dated February 14, 2005, Plaintiff reported that she experienced constant pain in her entire body and could do nothing without shortness of breath or passing out (Tr. 98-99). She indicated her daily activities included driving her children to and from school, laundry, cooking, and bathing (Tr. 99).

On February 9, 2005, Plaintiff's past employer reported that Plaintiff was "a very smart and capable employee. However, she spent too much time visiting with others or making personal phone calls and not completing her responsibilities." (Tr. 72). The former employer indicated that Plaintiff reported to work most of the time but that her work attendance was not satisfactory because she missed several days due to sick children and a few days to her own sickness (Tr. 70). The report also states Plaintiff did not require frequent breaks or rest periods for stress related reasons (Tr. 70). The report further states Plaintiff was able to maintain attention and concentration to assigned tasks for extended periods and she could perform tasks at a consistent pace (Tr. 71).

### B.  Medical Evidence Before the ALJ

---

[2] Also, vocational expert Dr. Benjamin Johnston ("VE") testified that if the Plaintiff's testimony was taken as fully credible, she could not maintain gainful employment due to her absences (Tr. 799). When considering the medical opinion of Dr. Eko, which states Plaintiff's condition would cause her to miss more than three days a month from work, the VE opined such absenteeism would prevent gainful employment because the vocational standard for the number of absences allowed a worker is one day per month (Tr. 799-800).

The parties' briefs contain a detailed review of Plaintiff's extensive medical history. Of particular relevance here is the evidence of Plaintiff's migraine headaches, which will be the primary focus of this summary.[3]

Beginning the day after Plaintiff's alleged onset date in October 2003, Plaintiff has been seen by her primary care physician, Dr. Eko (Tr. 412). Dr. Eko has treated Plaintiff for hypertension, diabetes, and various other medical issues and complaints (Tr. 371-412). Dr. Eko referred Plaintiff to Y. Charles Han, M.D., Ph.D., a neurologist at the Chattanooga Neurology and Headache Center (Tr. 328-29).

On February 8, 2005, when Plaintiff began treatment with Dr. Han, she was evaluated for frequent episodes of "passing out spells" preceded by dizziness, loss of balance, feeling hot, and difficulty breathing (Tr. 328). Plaintiff indicated that she had been diagnosed with SVT and that some of her spells were preceded by her heart racing (Tr. 328). Dr. Han noted that after the spells, Plaintiff experienced "really bad headaches" and after some spells, she felt extreme fatigue and weakness (Tr. 328). Plaintiff said she had always felt anxious and nervous and had experienced panic attacks and her other medical problems included hypertension and diabetes (Tr. 328). Dr. Han recommended long term video EEG monitoring, an EMG, and medical treatment for anxiety disorder (Tr. 329).

At a follow-up appointment one month later, on March 24, 2005, Dr. Han noted that a routine EEG test showed no evidence of seizure activity (Tr. 327). Plaintiff indicated that she felt fatigue and dizziness all the time and she complained of pain in her knee and shoulder joints, legs, and other

---

[3] While there are often multiple copies of the relevant documents in the record, only one citation to the record will be provided herein.

locations (Tr. 327). She stated that Klonopin, an anxiety medication, seemed to be working, but was not strong enough, as she still felt anxious and nervous, although not as much as before (Tr. 327). Dr. Han recommended further blood tests and EEG testing (Tr. 327). At both the February 8 and March 24, 2005 appointments, a mini mental status exam and motor exam of Plaintiff were normal (Tr. 327, 329).

On April 23, 2005, Plaintiff was seen at Winchester Urgent Care for evaluation of cough, congestion, runny nose, fever, sore throat, ear pain, and general malaise (Tr. 757). It was noted that her diabetes was poorly controlled (Tr. 758). She returned on May 10, 2005, for evaluation of TSH-results (Tr. 755). Plaintiff indicated an increased number of palpitation events as well as bouts of rapid heart beat (Tr. 755). Her test results were at the upper end of possible early hyperthyroidism, a potential reason for heart palpitations (Tr. 756). She was instructed to follow up with cardiology (Tr. 756).

On May 12, 2005, Plaintiff saw Dr. Han again for long term video monitoring to evaluate her passing out spells (Tr. 324). During the visit, she complained of migraine headaches and Dr. Han recommended Imitrex, emphasized the importance of headache prevention, and prescribed Topamax (Tr. 324-25). He also noted that Klonopin was working well at reducing the number of Plaintiff's panic attacks and he noted his belief that "[p]robably anxiety with panic attacks is the fundamental problem." (Tr. 325).

On June 14, 2005, Plaintiff began treatment with John Lee, M.D., a cardiologist (Tr. 470). She alleged worsening palpitations, tachycardia, and dizziness episodes (Tr. 470). She indicated that her fatigue, weakness, and palpitation problems had progressively worsened over the last three to four years (Tr. 470). She described "minor spells" three to four times per week, which lasted 15 to

20 minutes (Tr. 471). She characterized these episodes with mild to moderate tachycardia and palpitations, dizziness, dyspnea, diaphoresis, and heart rates up to 120 beats per minute (Tr. 471). She reported "bad spells" occurring every two to three months which were like the minor spells, but more prolonged, 45 to 60 minutes, with more severe symptoms (Tr. 471). Plaintiff reported that she was able to perform light to moderate housework only three to four days each week and walk no more than one block on a good day (Tr. 470). Dr. Lee advised that EKG results were unchanged from prior tracings and he was at a loss to explain the severity and duration of Plaintiff's symptoms (Tr. 473). He added that Plaintiff's acknowledged anxiety and panic, which accompanied her tachycardia episodes, contributed to some or perhaps most of her associated symptoms (Tr. 473). He continued Plaintiff on Metoprolol, ordered an ambulatory ECG, and instructed her on a walking/exercise program (Tr. 473-74).[4]

In a follow-up visit on June 23, 2005, Dr. Han noted that Plaintiff's long term video EEG showed no evidence of epileptic discharges (Tr. 323). Dr. Han indicated that Plaintiff's primary problem was "poorly controlled anxiety with panic attacks" and that Klonopin had been working well (Tr. 323). He reported that Plaintiff told him that Imitrex "worked really well for her migraine headaches. Topamax is also working for headache prevention. She denied any side effects." (Tr. 323). Plaintiff continued to complain of fatigue and lack of energy and Dr. Han advised her not to drive if her anxiety was not under control (Tr. 323). Although a follow-up visit was scheduled to take place two months later, Dr. Han's notes do not indicate he saw Plaintiff again until March 2,

---

[4] On August 2, 2005, Dr. Lee reported that Plaintiff was walking 10 to 20 minutes a day and she reported slight improvement in her overall energy level and stamina (Tr. 466). A subsequent echocardiogram, dated November 16, 2005, showed normal left ventricular systolic function and size (Tr. 457).

2006.

On June 24, 2005, Thomas Pettigrew, Ph.D. performed a psychological evaluation (Tr. 330). Plaintiff reported problems with anxiety attacks, SVT, diabetes, high blood pressure, rheumatoid arthritis, and Meniere's disease (Tr. 331). Plaintiff reported that her activities included doing housework, depending on how she felt; shopping sometimes; eating at restaurants; attending church; watching television; reading sometimes; swimming; and going to ball-games to watch her son play (Tr. 333-34). Dr. Pettigrew reported that Plaintiff exhibited no manifest signs of anxiety or panic, and she exhibited no pain behavior (Tr. 333). He noted that Plaintiff was "markedly somatically preoccupied and described symptoms of diverse physical and psychological problems with remarkable affective indifference. She appeared to be quite suggestible and may be inclined to readily identify with and endorse symptoms of multiple physical and psychological disorders." (Tr. 333). Dr. Pettigrew indicated that Plaintiff's clinical presentation provided no support for her complaints of depression and "panic attacks" and he diagnosed personality factors and coping style affecting medical condition and histrionic personality disorder traits (Tr. 333-34). He found no mental limitations (Tr. 334).

On July 15, 2005, Emelito Pinga, M.D., examined Plaintiff who reported that she had been diagnosed with migraine headaches in 2003 (Tr. 336). Plaintiff described that she experienced headaches weekly and they lasted a few hours and Dr. Pinga noted the headaches were "sharp in character which starts at the frontal temporal area radiating to the occipital area." (Tr. 336). He noted that bright lights and loud noises aggravated the headaches, and Plaintiff occasionally had nausea and vomiting during the headaches (Tr. 336). Plaintiff told Dr. Pinga that Topamax and Imitrex helped to relieve her headaches (Tr. 336). Her complaints to Dr. Pinga also included urinary

bladder infections, hypothyroidism, heart problems, hypertension, diabetes, low back pain, gastroesophageal reflux disease (GERD), and obesity, but she reported that her hypothyroidism had resolved (Tr. 336-37). She took medication for her heart problem, and on exam, she had regular heart sounds (Tr. 337). Dr. Pinga indicated that Plaintiff's blood pressure was under control with medication, but her diabetes was poorly controlled (Tr. 337). Plaintiff took Tylenol Arthritis for her back pain, and on examination, there was no evidence of spinal deformity or tenderness and no evidence of neurological deficits (Tr. 337, 340-41). With regard to her GERD, Plaintiff took Rantidine, and Dr. Pinga noted that Plaintiff was obese at 262 pounds (Tr. 338). Dr. Pinga opined that Plaintiff could sit six hours in an eight-hour workday, walk or stand for four hours in an eight-hour workday; she would be limited to lifting 15 pounds occasionally and five to ten pounds frequently (Tr. 342). Dr. Pinga's consultative report does not state whether or not Plaintiff's migraine headaches would require her to take unscheduled breaks or be absent from work, but his clinical impression notes she is receiving medication for her migraine headaches (Tr. 343).

On September 29, 2005, Dr. Eko completed a physical RFC questionnaire and noted Plaintiff's diagnoses as hypertension, diabetes, and seizures (Tr. 366). He also noted she had depression and anxiety and suffered from symptoms of drowsiness, nausea, and headaches (Tr. 367). He opined that Plaintiff had moderate limitation in the ability to deal with work stress (Tr. 368). As a result of her impairments, Dr. Eko estimated Plaintiff's functional limitations if she were placed in a competitive work setting as follows: she could maybe walk half a city block; she could sit for 15 minutes continuously and stand for ten minutes continuously; in an eight-hour work day, she should sit and stand/walk less than two hours each (Tr. 368). He indicated that Plaintiff would daily need to take unscheduled breaks during an eight-hour workday, and would need to rest for 30

minutes before returning to work (Tr. 368-69). He indicated that, with prolonged sitting, Plaintiff would need to elevate her leg(s) (Tr. 369). He opined that Plaintiff could never lift and carry even less than ten pounds in a "competitive work situation" (Tr. 369). He indicated significant limitations in her ability to perform repetitive reaching, handling, or fingering and he opined Plaintiff could not bend or twist (Tr. 369-70). He stated Plaintiff would have good and bad days and, as a result, she would be absent from work more than three times a month (Tr. 370). He also opined that "SVT-Anxiety" would affect Plaintiff's ability to work at a regular job on a sustained basis (Tr. 370). He stated that the limitations indicated applied since October 31, 2003 (Tr. 370).

On November 15, 2005, Plaintiff went to the emergency room at Southern Tennessee Medical Center and was subsequently admitted, following complaints of difficulty breathing, heart racing, lightheadedness, and numbness and tingling in her feet (Tr. 493, 515). An EKG showed sinus tachycardia (Tr. 493). A chest x-ray was normal (Tr. 460). Plaintiff was transferred to Harton Regional Medical Center, and ultimately discharged on November 18, 2005, with a diagnosis of panic attacks, history of migraine syndrome, and SVT without documented arrhythmia (Tr. 515). She was advised to remain on Klonopin twice a day, take Ativan as needed for extreme anxiety, and to return to her neurologist "as soon as possible" (Tr. 515).

Plaintiff returned to Dr. Han, but not until March 2, 2006, with complaints of worsening headaches, dizziness, and seizure symptoms (Tr. 782). He also noted that since he had last seen her, she had gone to a local hospital three times and during a hospital stay she was taken off Topamax (Tr. 782). Dr. Han stated that Plaintiff's problems included "terrible headaches, constant, sharp and throbbing, with intensity graded as 10/10" (Tr. 782). On examination, Plaintiff had severe pain in her skull base and her upper cervical facet joints were very tender (Tr. 782). Dr. Han believed that

Plaintiff's seizure activity was nonepileptic (Tr. 782). Based on the severity of her headaches, Dr. Han recommended, and Plaintiff underwent, a steroid injection, which provided headache relief almost immediately (Tr. 782). Dr. Han recommended Plaintiff restart Topamax for headache prevention, and indicated that it was also a seizure medication, which could work for her anxiety (Tr. 782).

During follow-ups on April 5 and May 23, 2006, Dr. Han advised that Plaintiff's level and amount of anxiety had dramatically decreased, the medications had worked "tremendously" for her headaches, and they were now under "excellent control" with Topamax, but she had minimal or mild tenderness in the skull base (Tr. 780-81). On July 11, 2006, however, Plaintiff returned to Dr. Han for evaluation of "terrible headache" (Tr. 779). She reported that, since her last visit, the pain started getting worse and more frequent, and she had at least a few episodes in a single week (Tr. 779). Dr. Han opined that at this point the medications were not strong enough and Plaintiff's pain intensity was graded at a ten out of ten (Tr. 779). Dr. Han performed a physical exam that showed severe pain in Plaintiff's skull base affecting the atlanto-occipital atlanto-axial joints and he also noted her greater occipital nerves were also very tender (Tr. 779). Dr. Han stated his clinical findings were "consistent with cervicogenic headache secondary to recurrent migraine headache, causing chronic inflammatory process." (Tr. 779). Plaintiff was given another occipital nerve block injection, which provided immediate and complete headache relief (Tr. 779). Dr. Han renewed Plaintiff's prescription for Topamax and Maxalt for breakthrough pain control (Tr. 779).

A month later, on August 11, 2006, Plaintiff returned for a follow-up visit and medication refill (Tr. 778). She continued to report significant improvement in her headaches, without side effects from medication (Tr. 778). Dr. Han noted the intensity of Plaintiff's headache pain was three

out of ten and occurred on an occasional basis (Tr. 778). Dr. Han noted the injections worked a "miracle" and he refilled her prescription for Topamax (Tr. 778).

Again a month later, on October 9, 2006, Plaintiff reported the return of a headache, but it was less severe than in the past (Tr. 777). Plaintiff reported that Topamax still worked, and Maxalt controlled breakthrough pain, and she continued to take Klonopin for anxiety (Tr. 777). Dr. Han did not see Plaintiff again for her headache condition until July 2007 (Tr. 776).

In the meantime, however, Plaintiff was seen at Winchester Urgent Care, where she had been seen in the past for various acute conditions, as well as complaints of fatigue, lightheadedness, pain across the chest, SVT and palpations, headache, flank pain, low back pain, and anxiety (Tr. 593-749). On December 13, 2006, Plaintiff presented to Winchester Urgent Care reporting blacking out and falling (Tr. 649, 767). She stated she had a mild aura, but no generalized tonic-clonic movements or incontinence (Tr. 767). She was subsequently evaluated with an EEG at Vanderbilt University Medical Center with negative results (Tr. 767). A recent Holter monitor was also noted to be normal (Tr. 767). On February 12, 2007, based on her recurrent syncope versus seizure disorder, she was admitted for an internal loop recorder implant (Tr. 766-67). On April 23, 2007, Plaintiff presented to Winchester Urgent Care for complaints of vomiting and diarrhea, body aches, stomach cramping, and headache with pain intensity of seven to eight out of ten (Tr. 608). Again on May 29, 2007, she was evaluated at Winchester Urgent Care for complaints of headache, tightness in the chest, and heart racing for five days (Tr. 601). She was diagnosed with poorly controlled diabetes, hyperglycemia, fatigue, dehydration, palpitations, and exacerbation of GERD (Tr. 602). On July 6, 2007, about one week prior to her hearing, Plaintiff returned to Winchester Urgent Care complaining of headache for two weeks with a pain intensity of ten out of ten (Tr. 593).

It was noted that she was unable to get an appointment with Dr. Han until July 16 (Tr. 593). She complained the headache was intermittent, photophobic, and she could not sleep (Tr. 593).

Several days after the hearing, Plaintiff returned to Dr. Han on July 16, 2007, complaining of worsening headaches (Tr. 776). He noted her last office visit with him had been about ten months ago and that she had been doing "really well" with Topamax for headache prevention and Klonopin for anxiety; however, "over the past few months the pain started coming back and hitting her really bad" (Tr. 776). He noted her headache pain was constant again with an intensity of ten out of ten (Tr. 776). According to Dr. Han's notes, Plaintiff said she did not think that Topamax helped her anymore, and she requested additional pain management (Tr. 776). On physical exam, Dr. Han found Plaintiff had severe pain in her skull base affecting the bilateral atlanto-occipital and atlanto-axial joints as well as occipital nerves, and he noted Plaintiff was "about to scream" with pain and was nauseated during the examination (Tr. 776). Dr. Han opined that his clinical findings were "consistent with cervicogenic headache secondary to underlying intractable migraine causing chronic inflammatory process," he noted that Plaintiff's "medications do not work well," and he recommended that Plaintiff have another injection as they worked well in the past. (Tr. 776). Dr. Han administered an injection, which relieved her headache immediately, he emphasized the importance of headache prevention, and advised Plaintiff to try Lyrica (Tr. 776). A follow-up visit was scheduled to take place in two months (Tr. 776).

### C. Medical Evidence Submitted to the Appeals Council

After the ALJ's decision, Plaintiff submitted additional evidence to the Appeals Council (Tr. 561- 91). The additional evidence included two reports from Dr. Han. The first report is dated December 18, 2007, more than one month after the ALJ's unfavorable decision and five months

after her last reported visit with Dr. Han. In the report, a headaches RFC questionnaire (Tr. 561-65), Dr. Han said that he had treated Plaintiff since February 8, 2005, and that her diagnoses were "severe disabling migraine headache, seizure, anxiety disorder, Meniere's disease" (Tr. 561). He stated that Plaintiff had migraine headaches with nausea, vomiting, malaise, photosensitivity, visual disturbances, and mood changes (Tr. 561). Dr. Han reported that Plaintiff experienced headaches "initially daily" but after treatments, they were "better" but she still had frequent weekly/monthly headaches and the headaches would persist "life-long" (Tr. 561). Dr. Han indicated that Plaintiff's headaches were triggered by bright lights, lack of sleep, menstruation, noise, stress, strong odors, and weather changes (Tr. 562). He identified anxiety/tension, cervical disc disease, migraine, seizure disorder, and sinusitis as impairments explaining Plaintiff's headaches (Tr. 562). He also indicated that emotional factors contributed to the severity of Plaintiff's headaches very much (Tr. 563). Dr. Han stated that Plaintiff had responded well to treatment of medications and steroid injections and that she experienced dizziness as a side effect of Lyrica (Tr. 563). Dr. Han indicated that Percocet was not strong enough when Plaintiff was in pain, and Topamax was not helpful (Tr. 563). Dr. Han opined that Plaintiff's prognosis was poor, and her impairment was expected to last at least 12 months (Tr. 563). Dr. Han also opined that Plaintiff would be precluded from performing even basic work activities; would need a break from the workplace during a headache; would need unscheduled breaks during an eight-hour workday when in pain, and would be off work days or weeks (Tr. 564). Dr. Han also opined that Plaintiff was incapable of even low stress jobs due to the severity of the pain, vomiting, light sensitivity, and physical fatigue (Tr. 564). He anticipated that Plaintiff's impairment or treatment would cause her to be absent from work more than three times a month (Tr. 564).

In the second report, which is dated about a year later on November 11, 2008, Dr. Han gave an update by completing a form in which he checked that Plaintiff experienced migraine headaches and muscle tension headaches with prodromal symptoms and symptoms of anorexia, nausea, vomiting, irritability, photophobia, and increased sensitivity to noise (Tr. 590). He noted that Plaintiff experienced headaches more than once a day or daily and they lasted several days (Tr. 590). He opined that Plaintiff was not able to work while experiencing a headache (Tr. 591). He noted that the limitations he indicated applied as of February 8, 2005, the first time he saw Plaintiff, but that her pain started even before that time (Tr. 591). He commented, "she suffers horrible migraine headaches causing significant mental, physical impairments during migraine attacks." (Tr. 591).

### D.     ALJ's Findings

After the hearing, the ALJ issued an unfavorable decision in which he found that Plaintiff had not been disabled during the time period she alleged (Tr. 13-27). At step one, the ALJ found that Plaintiff had met the insured status requirements of the Social Security Act through December 31, 2007 and that she had not engaged in substantial gainful activity since October 30, 2003, the alleged onset date. At step two, the ALJ found Plaintiff had several severe impairments: obesity, degenerative changes in the lumbar spine, mild cardiac dysfunction, diabetes, and hypertension (Tr. 15). At step three, he found she did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments. Between steps three and four, he found that Plaintiff had an RFC to perform a full range of sedentary work. At step four, he found her restrictions would not preclude the performance of her past relevant work as a financial coordinator. Therefore, the ALJ found that was not under a disability from October 30, 2003 to the date of his decision, November 9, 2007.

# III.    ANALYSIS

In this appeal, Plaintiff challenges the ALJ's assessment of her RFC, principally arguing the ALJ improperly considered her credibility and migraine headache pain and erroneously gave little to no weight to the disabling opinion of Dr. Eko.  Plaintiff also seeks a remand under sentence six of 42 U.S.C. § 405(g) to consider the two additional reports of Dr. Han.

## A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence.  42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight."  *Id.* (internal quotes omitted).  If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings.  *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971).  The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility.  *Garner*, 745 F.2d at 387.  The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court is under no obligation to scour the record for errors not identified by the claimant,

*Howington v. Astrue*, 2009 WL 2579620, *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived). The court may, however, consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

Evidence submitted after the close of administrative proceedings cannot be considered for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Similarly, where the claimant presents new evidence to the Appeals Council, but the Appeals Council declines to review the ALJ's decision, that new evidence may not be considered during review on the merits. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). Instead, the new evidence can be considered only for purposes of remand pursuant to sentence six of 42 U.S.C. § 405(g), which authorizes the court to remand a case for further administrative proceedings "if the claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

B. **Substantial Evidence**

Plaintiff asserts substantial evidence does not support the ALJ's decision because the ALJ erred in assessing her credibility, her subjective complaints of migraine headache pain, and her activities of daily living. Contrary to Plaintiff's argument, I **FIND** the ALJ thoroughly reviewed the

evidence and found, based in part on his credibility assessment, that Plaintiff's impairments could reasonably cause some degree of work restriction, but not to the degree she alleged and not to the extent that they were inconsistent with an ability to perform a full range of sedentary work. In finding Plaintiff's complaints of pain to be less than fully credible, the ALJ properly listed several reasons for his assessment of Plaintiff's credibility, including that she was inconsistent in her statements about the severity and frequency of her symptoms and the effectiveness of her medication, that she experienced no significant change in her medical condition supporting a need to quit work in or around her alleged onset date, that her former employer's statement indicated factors other than her medical condition may have prompted her to quit working, and that her activities of daily living belied her contentions.

Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *See King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984). The ALJ cannot base his credibility finding on intuition, but must give "specific reasons for the finding on credibility, supported by the evidence in the case record," which are "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the [claimant's] statements and the reasons for that weight." SSR 96-7p (1996); *Rogers*, 486 F.3d at 247-48. The ALJ must consider a claimant's credibility in light of all the evidence in the record, including the claimant's own statements regarding the nature and severity of her symptoms, her daily activities, her prior work record, her physicians' medical diagnoses, prognoses, and opinions, her medications and other treatments, and any other relevant factors. SSR 96-7p. The ALJ also must state the reasons for his assessment of the claimant's credibility, and those reasons must themselves be grounded in the record. SSR 96-7p; *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x

852, 863 (6th Cir. 2011).

Headaches, as argued by Plaintiff, have few objective findings. Plaintiff contends the ALJ improperly relied on a lack of objective medical evidence to evaluate the severity of Plaintiff's migraines and improperly based his credibility finding on a perceived inconsistency with isolated treatment notes, rather than the longitudinal medical record. Contrary to Plaintiff's contentions, however, the ALJ did not rely solely on the absence of significant objective medical evidence when evaluating the credibility of Plaintiff's complaints regarding her headaches. Rather, the ALJ considered Dr. Han's treatment notes and permissibly found they indicated that Plaintiff's headaches were well controlled with the use of Topamax and occasional trigger point injections, at least until July 2007. The ALJ reasonably considered this evidence to discount Plaintiff's allegations of disabling migraine headache pain during the relevant time period. *See* 20 C.F.R. § 404.1529(c) (ALJ may consider effectiveness of any medication taken to alleviate pain or other symptoms when assessing a claimant's credibility).

The ALJ also considered Plaintiff's inconsistent statements regarding the effectiveness of her medication and the frequency of her headaches. "Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach*, 409 F. App'x at 863. At the hearing on July 12, 2007, Plaintiff testified that she took Topamax every day, that Topamax did a good job of resolving her headaches, and that she had one to two headaches weekly. A few days later on July 16, 2007, however, Plaintiff told Dr. Han that her headaches had worsened over the past few months, that they were constant, and that Topamax no longer helped (Tr. 776). The ALJ properly considered these inconsistencies when determining whether Plaintiff's

20

subjective complaints were credible. *Id.*; SSR 96-7p (one strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the record). Contrary to Plaintiff's argument, the ALJ's interpretation of Plaintiff's testimony that Topamax did a good job of resolving her headaches was fair and reasonable. Similarly, the ALJ properly noted inconsistencies with the frequency of her reported headaches. Plaintiff's treatment for headaches on April 23, May 29, and July 6, 2007 does not render the ALJ's conclusion improper as there is an inconsistency between claiming headaches once or twice a week and claiming constant headache.

As noted above, the ALJ also found Plaintiff's daily activities contradicted her allegations of significant pain and weakness and were inconsistent with the standing and walking restrictions she alleged. A claimant's daily activities may undermine her credibility to the extent they are inconsistent with her testimony. *Compare Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (claimant's activities of washing dishes, light cooking, laundry, reading, bathing, traveling to a national park, shopping, spending time with friends, and attending church were inconsistent with her allegations of total disability) with *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006) ("the fact that Plaintiff engages in minor life activities is not inconsistent with a disabling level of pain."). In making his adverse credibility determination, the ALJ reasonably considered that Plaintiff's ability to drive five days a week, shop for groceries a few times each month, prepare meals, do laundry, and to occasionally take her children to her mother's house to play in the pool was inconsistent with her allegations and the degree of limitation she claimed.

The ALJ also reasonably considered a form completed by Plaintiff's prior employer stating that Plaintiff was a smart and capable employee, but she spent too much time visiting with others and making personal phone calls and not completing her responsibilities. The employer also

indicated that Plaintiff did not require frequent breaks or rest periods for stress related reasons. The ALJ reasonably considered this report to suggest that factors other than her alleged medical condition may have prompted Plaintiff to stop working.

The Court does not determine a claimant's credibility and is not necessary to further address all of the reasons the ALJ gave for his credibility assessment as the above reasons are sufficient to support his assessment. As noted above, the court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. I **FIND** the ALJ's credibility assessment is supported by substantial evidence and entitled to great weight and deference.

### C.      Dr. Eko's Opinion

An ALJ is obligated to give "controlling weight" to a treating physician's opinion so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2). Even if not entitled to controlling weight, a treating physician's opinion is entitled to weight commensurate with the length of the treating relationship and the frequency of examination, the nature and extent of the treating relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*. Furthermore, when the ALJ discounts a treating physician's opinion, he is obligated to give "good reasons" for doing so. *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p). Those reasons must be "supported by the evidence in the case record" and "sufficiently specific to make clear to any subsequent reviewers the weight [given] to the . . . opinion and the reasons for that weight." *Id.*

The ALJ reasonably found that Dr. Eko's treatment notes did not contain objective findings

supporting the level of limitations he indicated. As such, it was proper to discount his opinion. *See* 20 C.F.R. § 404.1527(d)(3). In particular, the ALJ found that none of the diagnoses Dr. Eko listed supported his opinion regarding Plaintiff's standing, walking, sitting, or lifting limitation and there was no support for manipulative/handling restrictions. The ALJ also considered that the other medical evidence did not support the level of limitation indicated by Dr. Eko. In addition, and contrary to Plaintiff's assertion, her own testimony regarding her lifting limitations was inconsistent with Dr. Eko's opinion. Because the ALJ found that the medical records did not support Dr. Eko's limitations, he reasonably gave Dr. Eko's opinion little to no weight. *See* 20 C.F.R. § 404.1527(d)(4).

In addition, the ALJ gave several good reasons for giving Dr. Eko's opinion, and in particular his September 29, 2005 assessment, little to no weight. For example, the ALJ believed Dr. Eko's opinion was based on Plaintiff's "self reported limitation" rather than objective evidence (Tr. 25). When a treating physician's opinion is based on a claimant's subjective reports which are themselves not credible, it is not error to assign little weight to the opinion. *See Vorholt v. Comm'r of Soc. Sec.*, 2011 WL 310700, *6 (6th Cir. 2011) (unpublished) (affirming rejection of treating physician's opinion which relied on the "false record" supplied by the claimant). The ALJ offered several additional specific reason for discounting Dr. Eko's opinion, and his careful explanation shows he did in fact consider the medical evidence and the contrary opinion evidence. Therefore, I **FIND** the ALJ gave good reasons for discounting Dr. Eko's opinion. In sum, I **CONCLUDE** that

the RFC finding challenged by Plaintiff is supported by substantial evidence.[5]

### D. Additional Evidence

As noted above, pursuant to sentence six of 42 U.S.C. § 402(g), the Court may remand a case for further administrative proceedings if Plaintiff shows the evidence is new and material and there was good cause for her failure to present the evidence to the ALJ. *Cline*, 96 F.3d at 148. Evidence can be considered new only if (1) it is not cumulative of other evidence in the record and (2) it was "not in existence or available to the claimant at the time of the administrative proceeding." *Hensley v. Comm'r of Soc. Sec.*, 214 F. App'x 547, 551 (6th Cir. 2007); *Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Evidence is "material" when "there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). And a plaintiff shows "good cause" if she can demonstrate a "reasonable justification for her failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. Good cause requires more than a showing that evidence was not obtained until after the hearing; instead, the claimant must show a "valid reason" for failing to obtain the evidence prior to the hearing. *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986). The burden of proof is on Plaintiff to show that a remand is appropriate. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 653 (6th Cir. 2009).

---

[5] Plaintiff correctly notes the ALJ's misstated that Dr. Eko indicated Plaintiff was unable to perform "any activity" for more than two hours a day, when Dr. Eko's assessment related only to her ability to perform "work activity." Contrary to Plaintiff's assertion, however, the ALJ considered Dr. Eko's limitations as relating to a workday. The ALJ discussed Dr. Eko's opinion in detail and indicated that Dr. Eko opined that Plaintiff could "stand /walk and sit *for less than a total of 2 hours* during an 8-hour workday" (Tr. 26) (emphasis in original).

Plaintiff made a request at the hearing to hold the record open in order to submit additional evidence from Dr. Han. Plaintiff did, in fact, submit to the ALJ updated clinic records from Dr. Han on October 8, 2007 that included Plaintiff's visit with him on July 16, 2007. As argued by the Commissioner, there is no indication that, at the time she submitted the updated additional records, Plaintiff requested that the record continue to be held open for the submission of even more additional information (Tr. 592).

The ALJ's decision was rendered on November 9, 2007. The December 18, 2007 and November 11, 2008 reports from Dr. Han were not in existence at the time of the administrative proceedings. However, Dr. Han's opinions regarding Plaintiff's limitations on her ability to work were available to Plaintiff prior to the close of the administrative proceedings as Dr. Han himself noted that the disabling limitations he reported applied as of February 8, 2005, the first time he saw Plaintiff, and that her pain started even before that time (Tr. 591). Thus, Dr. Han's opinion was "available" to Plaintiff and his reports, as argued by Defendant, are not truly new.

Even if the reports were to be considered new, moreover, Plaintiff cannot show good cause. Plaintiff argues Dr. Han did not complete the reports prior to the unfavorable decision, but she provides no reason why she did not obtain an opinion from Dr. Han (an opinion he indicated he held from his initial treatment of Plaintiff) regarding her limitations prior to the close of the administrative proceeding. Plaintiff has not shown good cause as she has not provided a reasonable justification for her failure to acquire and present the evidence for inclusion in the hearing before the ALJ or in the grace period he gave her for the submission of additional evidence. *See Foster*, 279 F.3d at 357; *Oliver*, 804 F.2d at 966. Thus, Plaintiff fails to carry her burden under the Sixth Circuit's good-cause standard. *Id.*

## IV.    CONCLUSION

For the foregoing reasons, I **RECOMMEND:**[6]

(1)     Plaintiff's motion for summary judgment [Doc. 9] be **DENIED**;

(2)     Defendant's motion for summary judgment [Doc. 13] be **GRANTED**;

(3)     The Commissioner's decision denying benefits be **AFFIRMED;** and

(4)     This action be **DISMISSED WITH PREJUDICE**.

s/ *Susan K. Lee*

SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order.  *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).